IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE ) | |
| SEARCH OF: The Premises located at ) | |
| ) | |
| ) | CASE NUMBER:_____ |
| xxxx xxxxxxxxxx xxxxxxxx xx ) | |
| Washington, DC 20020 ) | |
| ) | |

**<u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANT</u>**

I, Luke Edward McGuire, a Special Agent of the United States Drug Enforcement Administration (DEA), having been duly sworn, state as follows:

1. This affidavit is made in support of an application to search the premises located at xxxx xxxxxxxxxx xxxxxxxxx xx, Washington, DC, 20020. Your affiant believes probable cause exists that Stephen Wesley COLEMAN resides at xxxx xxxxxxxxxx xxxxxxxxx xx, Washington, DC, which is described as a multi-level residential dwelling constructed of brick and mortar. The exterior of the home has been painted in an off-white color, with what appears to be an addition on the back of the house consisting of a curved brick wall and glass block. The driveway is to the right of the front entrance door, which is secured by a light-green colored security-grill outer-door. The numbers "3846" appear over the front entrance door. As set forth in greater detail below, there is probable cause to believe that COLEMAN has committed the following federal offenses: (i) conspiracy to distribute and to possess with intent to distribute controlled substances, in violation

1

of Title 21, United States Code, Section 846 and (ii) the possession with intent to distribute and the distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1). Accordingly, there is probable cause to believe that fruits, instrumentalities, and evidence of the above-described violations will be found at xxxx xxxxxxxxxx xxxxxxxxx xx, Washington, DC.

2.     I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516(1) of Title 18, United States Code.

3.     I have been a Special Agent with the DEA for over two years. Prior to my tenure at DEA, I have served as a law enforcement officer with various federal and local government agencies since July of 1994. As a Special Agent of the DEA, I have participated in investigations involving unlawful narcotics distribution. I have participated in the execution of numerous search warrants, which resulted in the seizure of controlled dangerous substances and I have authored an affidavit in support of a seizure warrant, which resulted in the seizure of illegal drug distribution proceeds. Through these investigations, information gathered from experienced agents, and training, I have become familiar with the methods used by individuals engaged in narcotics trafficking. Through investigations and training, I have also become familiar with the use by drug traffickers of telephones to communicate, the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the activities and

nature of the profits from their illegal drug dealings.

4.      The information contained herein is based on personal knowledge, information provided to your affiant by sworn law enforcement officers, and information obtained from public records, cooperative witnesses, and other sources as indicated herein.

5.      Based on my training, experience, and participation in narcotics investigations and the training and experience of other agents who have relayed information to me, I know that:

a)      Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale, and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, etc., are maintained in locations to which the dealers in illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends, and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

b)      Individuals who deal in illegal controlled substances routinely conceal large quantities of currency, financial instruments, precious metals, jewelry and other items of value, typically proceeds of illegal controlled substance transactions. Indeed, when drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits. To

accomplish this, drug traffickers may utilize domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks, money drafts, letters of credit, and safe deposit boxes. All of these items are generally found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

    c)  Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses and/or telephone numbers for their associates. These individuals often utilize cellular telephones, pagers and telephone systems to maintain contact with their associates in their illegal businesses. These telephone records, bills and pager numbers are often found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

    d)  Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

    e)  Persons who traffic in controlled substances maintain documents, letters and

records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, records in fictitious names, false identification, money orders, cashiers checks relating to cash transactions, and records indicating the existence of storage facilities used in narcotics trafficking.

6. Throughout this investigation, law enforcement officers and agents have worked together to gather and record information about the illegal activities of Stephen Wesley COLEMAN. I have participated in this investigation firsthand and have been provided additional information by other law enforcement officers to whom I have spoken or whose reports I have read and reviewed.

7. Except where otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that statement is described in substance and in part and is not intended to be a verbatim recitation of such statement. Moreover, this affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts, which are necessary to establish

that probable cause exists that COLEMAN has committed the above-listed criminal violations and that the fruits, evidence, and instrumentalities of the above-referenced criminal violations will be found at xxxx xxxxxxxxxx xxxxxxxx xx, Washington, DC.

## **PROBABLE CAUSE**

8. Based on my training, experience and participation in narcotics investigations, and the training and experience of other agents who have relayed information to me, I know that:

9. On May 26, 2005, your affiant along with members of the Washington Field Division's Mobile Enforcement Team of the Drug Enforcement Administration and officers of the Prince George's County, MD Police Department arrested an individual identified as Cooperating Witness One (herein referred to as CW1). After his arrest, CW1 contacted DEA Special Agent Brendan McSheehy from jail and stated he wanted to speak with agents. CW1 was advised of his Miranda rights, which were waived in writing and agreed to discuss his involvement in illegal drug trafficking.

10. CW1 stated that his source of supply was an individual known to him as "KI KI". CW1 described "KI KI" as a black male approximately fifty years old, approximately 5'10" to 6' tall, heavyset, with a receding hairline. CW1 stated that he met with "KI KI" a few days prior to his arrest when he received three (3) kilograms of cocaine from "KI KI." CW1 further stated that "KI KI" departed town and was in southern Florida for the weekend. CW1 stated that he believed "KI KI" was from the state of Georgia, but had contacts with a source of supply in Florida. CW1 stated that "KI KI" transports between eight (8) to ten (10) kilograms of cocaine to the Washington, DC

area, to include Prince George's County, MD approximately two to three times a month. CW1 stated these kilogram shipments often include packages with different markings.

11. Through various investigative techniques, including recorded telephone conversations between CW1 and "KI KI", your affiant learned that "KI KI" was in Florida and was planning a trip to the Washington, DC area on May 28, 2005. Your affiant learned that "KI KI" was flying on US Airways flight # 954, departing from Ft Lauderdale, FL at 7:45 PM and arriving at Reagan National Airport at approximately 10:05 PM. Surveillance was conducted at both airports and "KI KI", subsequently identified as Clarence McINTYRE, was observed by DEA Special Agent Cliff Brown as he boarded the plane in Ft Lauderdale, FL. Agent Brown provided the following description of McINTYRE: a black male, approximately forty-five to fifty years old, 5'10" tall, heavyset, receding hairline, wearing a pink-colored polo shirt with white stripes, dark blue shorts, and blue-colored boat shoes. A review of the passenger manifest for flight # 954 revealed McINTYRE'S name.

12. On May 28, 2005, at approximately 9:52 PM, members of the surveillance team observed McINTYRE as he arrived inside the terminal of Reagan National Airport. McINTYRE was observed as he collected his checked luggage from the baggage carousel and walked outside to a green Jaguar bearing District of Columbia license plate # AL-5179. A subsequent query identified the vehicle as being registered to Clarence COLEMAN at 3846 Carpenter St, SE, Washington, DC, 20020.

13. The surveillance team followed the Jaguar from Reagan National Airport directly to the Days Inn hotel located at xxxx xxxxxxxxxx xxxxxxxx xx , Camp Springs, Prince George's

County, MD. At approximately 10:30 PM, surveillance team members observed McINTYRE and the driver, subsequently identified as Stephen COLEMAN enter the Days Inn hotel carrying pieces of luggage, which were removed from the trunk of the Jaguar. COLEMAN and McINTYRE were observed entering a hotel room on the fourth floor.

14. At approximately 11:20 PM, COLEMAN was observed walking with another individual, later identified as Milton JOHNSON. Both individuals stepped into the Jaguar and departed from the Days Inn hotel. Surveillance team members relayed the movement of the Jaguar to Prince George's County uniformed Police Officer Norris, who spotted the Jaguar in the vicinity of the intersection of Auth Road and Branch Avenue, located in Camp Springs, MD. The officer observed a violation and initiated a traffic stop. Officer Norris was assisted by members of the Prince George's County Narcotics Enforcement Team as well as a K-9 unit from the PGPD Interdiction team. An exterior scan of the Jaguar was conducted with a certified drug detection dog, who gave a positive indication for the presence of drugs in the vehicle, specifically the trunk area of the car. A search of the vehicle revealed approximately two (2) kilograms of suspected cocaine, which were concealed in the spare tire well, inside the trunk of the vehicle. The suspected cocaine consisted of two individual packages wrapped in tan-colored packing tape. The packages were subsequently field-tested with positive results for the presence of cocaine.

15. After his arrest, JOHNSON waived his Miranda rights in writing and agreed to speak with investigators. JOHNSON initially stated that COLEMAN picked him up in the Jaguar in the state of Georgia and the two drove together to the Washington, DC area. JOHNSON later recanted and stated that he drove up from Georgia with McINTYRE in a rented Jeep (a Jeep bearing GA

registration was observed in the parking lot of the Days Inn). JOHNSON also admitted that he stayed in room # 424 at the Days Inn after McINTYRE asked him to watch it while he departed town. JOHNSON indicated that he did not leave the room between Thursday (May 26, 2005) and Saturday, May 28, 2005. JOHNSON also stated that he had been arrested for narcotics trafficking in Florida in the early 1990's and was aware that McINTYRE was also involved in narcotics trafficking. However, JOHNSON said he was unaware that McINTYRE traveled from Georgia for the purposes of selling drugs, although he said he was suspicious when McINTYRE asked him to watch the hotel room. It should be noted that JOHNSON was in possession of two cellular telephones, one of which received several incoming calls from area code 954 and an alert from "KE KE."

16. Agents and officers attempted to contact McINTYRE at the Days Inn, room # 424 out of concern that he may have become alarmed when JOHNSON did not respond to his phone calls. However, McINTYRE refused to open the door. With the belief that additional narcotics and/or drug proceeds were in jeopardy of being destroyed, agents and officers forced entry into room # 424. McINTYRE was inside the room, which was secured until a state search and seizure warrant was issued for the room.

17. A state court authorized search and seizure warrant was issued for room # 424. Agents and officers conducted a search of the room and discovered approximately $21,570.00 dollars hidden beneath the bed spread as well as approximately $147,170.00 dollars found inside a safe in the room.

18. McINTYRE was advised of his Miranda rights, which he waived, and was

interviewed at the Days Inn hotel. McINTYRE stated that he rented a car in Florida and drove to Georgia where he met with COLEMAN and JOHNSON. McINTYRE stated he has known JOHNSON since attending high school with him. McINTYRE stated that he and JOHNSON then drove together from Georgia to the Washington, DC area in a rental car. McINTYRE stated that the drugs were transported from Georgia in a separate car driven by COLEMAN. McINTYRE stated that JOHNSON stayed in room # 424 to watch the money while he was out of town. McINTYRE said that COLEMAN paid him $5,000 for his help and that he traveled to Florida with the $5,000, of which he spent approximately $4,000 dollars. McINTYRE was in possession of approximately $1,435.80 at the time of his arrest.

19.     At the time of his arrest, COLEMAN provided agents and officers a District of Columbia driver's license with the address of xxxx xxxxxxxxxx xxxxxxxx xx, Washington, DC, 20020. COLEMAN stated that he lived at 3846 Carpenter Street with his parents. The Jaguar which COLEMAN used to transport the two kilograms of cocaine was registered to his father, Clarence COLEMAN at the same address. COLEMAN stated he worked for the Century 21 real estate business located at xxxx xxxxxxxxxx xxxxxxxx xx, Washington, DC. COLEMAN provided investigators with several telephone numbers, including a home telephone number of 202-584-6562.

20.     On June 1, 2005, U.S. Magistrate Judge Jillyn K Schulze of the District of Maryland issued arrest warrants for COLEMAN, JOHNSON, and McINTYRE. On June 24, 2005, JOHNSON and McINTYRE were presented for their initial appearance before Judge Killyn, who also presided over the detention hearings for JOHNSON and McINTYRE on June 27, 2005. On June 29, 2005,

a Grand Jury indicted COLEMAN, JOHNSON and McINTYRE for the violations listed herein. COLEMAN, who was bonded and released from the Prince George's County, MD detention center, remains at large.

21.   On June 29, 2005 at approximately 12:30 PM, DEA Special Agent Brown, acting in an undercover capacity, entered the Century 21 real estate office located at xxxx xxxxxxxxxx xxxxxxxxx xx Ave, SE, Washington, DC.  Agent Brown spoke with Century 21 employees and, expressing his interest in buying a home, asked for COLEMAN.  Agent Brown was told that COLEMAN was not in; however, COLEMAN was called by the office.  COLEMAN returned the call and spoke with SA Brown over the phone.  COLEMAN agreed to meet with SA Brown, but asked if they could schedule a meeting later in the week.  Agent Brown explained that he would be out of town for the upcoming holiday weekend and asked if he could see COLEMAN that afternoon. COLEMAN told Agent Brown he would call him in approximately one hour.    Century21

employees provided Agent Brown with the following telephone numbers for COLEMAN: 202-439-0085 and 202-584-6562.  COLEMAN did not call Agent Brown as he had promised.

22.     On June 29, 2005 at approximately 1:45 PM, agents drove by xxxx xxxxxxxxxx xxxxxxxxx xx, Washington, DC and observed an older model Mercedes sedan without a rear license plate and a silver-colored Mercedes sedan bearing District of Columbia license plate number CC-5317 parked in the driveway.  A subsequent query of the District of Columbia's Division of Motor Vehicles database revealed that the silver Mercedes was registered to Dolores R. COLEMAN at xxxx xxxxxxxxxx xxxxxxxxx xx, Washington, DC, 20020.

23.     Agents also observed a red-colored Land Rover bearing District of Columbia license plate number BT-6835 parked on the street in front of the house.  A subsequent query of the District of Columbia's Division of Motor Vehicles database revealed that the Land Rover was registered to Clarence H. COLEMAN at xxxx xxxxxxxxxx xxxxxxxxx xx, Washington, DC, 20020.

24.     On July 11, 2005 and again on July 14, 2005 at approximately 3:00 AM, DEA agents observed COLEMAN'S green Jaguar parked in front of xxxx xxxxxxxxxx xxxxxxxxx xx.  As stated above, Stephen Wesley COLEMAN utilized the green Jaguar registered to Clarence COLEMAN at xxxx xxxxxxxxxx xxxxxxxxx xx, Washington, DC to conceal and transport illegal drugs on May 28, 2005.

## **CONCLUSION**

25. Based on the foregoing facts, there is probable cause to believe that Stephen Wesley COLEMAN is involved in the following federal offenses, among others: (i) conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846 and (ii) the possession with intent to distribute and the distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1). Based on information gathered during the course of this investigation, there is probable cause to believe the fruits, instrumentalities, and evidence of the above-stated narcotics violations, as well as items enumerated in Attachment A will be found at xxxx xxxxxxxxxx xxxxxxxxx xx, Washington, DC, which is described more particularly in Paragraph 1.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____

Luke Edward McGuire           Date

Special Agent, Drug Enforcement Administration

Subscribed and sworn before me this _____ day of July 2005.

_____

UNITED STATES MAGISTRATE JUDGE

13

14

**ATTACHMENT A**

(A) Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records, relating to the transportation, ordering, purchasing and distribution of controlled substances, in particular, cocaine, a Scheduled II controlled substance;

(B) Computers, address and/or telephone books, papers, paging devices and their contents, and cellular telephones and their contents reflecting names, addresses and/or telephone numbers, including computerized or electronic address and/or telephone records;

(C) Books, records, receipts, income tax returns and supporting documents, work papers and summary sheets used in the preparation of tax returns, powers of attorney, any listings containing financial information, bank statements and record money drafts, letters of credit, money orders and cashier's checks, receipts, passbooks, bank checks, safety deposit keys, and any other items evidencing the obtaining, secreting, transfer, and/or concealment of assets in the obtaining, secreting, transfer, concealment and/or expending or money;

(D)   Bank statements, passbooks, deposit slips, withdrawal slips, cancelled checks, bank receipts, bank checks, money orders and receipts, safe deposit box keys and records, and other bank or financial institution records showing acquisition, conversion, movement, secreting, transfer and disbursement of currency;

(E)   United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds;

(F)   Records or real estate transactions, including, but not limited to, contracts, agreements, settlement sheets, payments and receipts of money, records or loan contracts, mortgages, notes, agreements, applications, payments and financial statements, records of credit cards, and records of purchase and/or financing of assets, business expenses and living expenses;

(G)   Photographs, in particular, photographs of co-conspirators, of assets, and/or of controlled substances, and other documents identifying associates and co-conspirators;

(H)   Employment records and personnel files, including employee lists, applications, forms W-2, 1099, W-4, ledgers, notes and correspondence;

(I)      Records of forming and operating corporations, partnerships, associations, businesses and other entities;

(J)      Indicia of occupancy, residence and/or ownership of the premises, including but not limited to, utility and telephone bills, canceled envelopes and keys;

(K)      Indicia of travel, including but not limited to, passport, visas, airline tickets, boarding passes, and hotel receipts;

(L)      Safes: combinations or lock type, and their contents;

(M)      <u>Computer and electronic equipment</u>: Any and all information and/or data described above stored in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing); any photocopies; any mechanical form (such as printing, or typing); any electrical, electronic or magnetic form or data (such as any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-roms, or printer buffers, as well as printouts or readouts from any magnetic storage device). Any and all electronic devices which are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components,

17

computer peripherals, word processing equipment, modem, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices; Any and all instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters and other programs of software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission; Any and all written or printed material which provides instructions or examples concerning the operation of a computer system, computer software and/or any related device; "Mirroring", "imaging", and/or replication is also authorized.

This warrant and this search procedure specifically exclude a search of any kind of unopened electronic mail. No search of unopened electronic mail shall be conducted without a separate search warrant supported by probable cause. Appropriate efforts shall be made to minimize the disclosure of records and other information which are not the subject of this warrant.

19